UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

JOHN LIPSEY, Individually and as )
father and next friend of JOHNAY )
LIPSEY, a disabled minor, )   12-2100
)
        Plaintiff, )
)
v. )
)
UNITED STATES OF AMERICA, et al., )
)
        Defendants. )

## ORDER ON SUMMARY JUDGMENT

The plaintiff, John Lipsey ("Lipsey"), is the custodial parent of Johnay Lipsey ("Johnay"), who was born in 2009 with significant physical and mental disabilities.

At the time of her birth, Johnay's mother, Wenona White ("White"), was in federal custody, housed in Jerome Combs Detention Center ("JCDC"), Kankakee County, Illinois.[1]

Lipsey has asserted two counts against the United States of America: a medical malpractice claim (Count I) and a claim under the Family Expense Act/Federal Tort Claims Act (Count V). White is not a party to this case.

The United States has filed a motion for summary judgment, arguing that the claims are barred by the provisions of the Federal Tort Claims Act.

## FACTS[2]

During the summer of 2009, White and others were wanted on federal bank fraud charges. At that time, White was pregnant with her tenth child.

When deposed, White stated that she did not receive prenatal care after June 2009 because she knew she was wanted by the police.[3] On September 10, 2009, White was located,

---

[1] Kankakee County operates two detention facilities. In this order, the court refers to the County and its detention facilities as "JCDC."

[2] The facts recited herein are relevant to the summary judgment motion filed by the United States. Additional facts may be relevant to the Kankakee County defendants' motion for summary judgment.

[3] A criminal complaint was filed against White in the Eastern District of Virginia on June 8, 2009. White was to self-surrender at the federal courthouse in Hammond on July 6, 2009.

taken into custody, and placed overnight at the St. Joseph (Indiana) County Jail. On September 11, 2009, White was transported to the United States Marshal Service ("USMS") cellblock at the United States Courthouse in Hammond, Indiana, for a court appearance. The court ordered White remanded to the custody of the USMS and transported to the United States District Court, Eastern District of Virginia. At that time, White was approximately thirty-five weeks pregnant. For that reason, the USMS arranged for White to be housed at JCDC pursuant to a contract for the safekeeping and care of federal detainees, with the expectation that she would remain there until after she gave birth to her child.

While in the custody of the USMS on September 11, 2009, White did not have any symptoms of illness or injury and there was no indication that she was in immediate need of medical treatment.

A chronology of relevant events is as follows.

**September 11, 2009** – JCDC officials transported White from the courthouse in Hammond to JCDC. The JCDC intake officer obtained information from White, completed an intake form noting that White's due date was October 18 and that her last medical exam was in August, and that she took prenatal vitamins. White claims that she does not recall whether she told the intake officer about any problems she was having with her pregnancy. White Dep. 77. White admits she did not inform the intake officer that with her ninth pregnancy she had placenta previa. White Dep. 78.

**September 16, 2009** – JCDC nurse Heather Gill ("Gill") saw White in the JCDC clinic. Gill's note states, "Inmate Seen in Clinic. Has had regular check ups with OB/GYN in Indiana. States this will be her 10th child. Denies any problems with pregnancy. Prenatal vitamins ordered. Will try to schedule apt with Dr. Mehta or Haile." White Dep. Ex. 15. White admits that she told a female nurse that she didn't have any problems with her tenth pregnancy. White Dep. 80.

**September 17, 2009** – JCDC officials had a routine meeting with medical staff. White's pregnancy was discussed. JCDC Chief of Corrections Michael Downey (Downey) states that he was concerned about White's pregnancy and their difficulty scheduling White with an obstetrician. The notes from the meeting reflect that Dr. Haile refused to take White as a patient that late in her pregnancy.[4] Downey stated at the meeting that he had contacted the USMS and asked that White be transferred to a different facility where obstetrical care might be more accessible. (Downey does not remember who he talked to, and USMS employees deny having

---

She did not do so, and was not apprehended until two months later.

[4] A log note written by Gill at or around the time of the meeting indicates, "Dr. Mehta and Hailie's office refused to see [White]. Informed Dr. Dayhoff. Will attempt to make [appointment] with Westwood OB." *See* Downey Dep. Ex. 6-4.

received such a call.) The meeting notes reflect that "the feds" told Downey it was impossible to move White at that time. Follow-up notes indicate that Downey would continue to work on a transfer, an emergency delivery kit would be ordered, and the health care staff would monitor White very closely.

**September 18, 2009** – JCDC physician's assistant Timothy Menard ("Menard") attempted to have White come to the health care unit. A log note written by Menard states, "[White] refused to be seen this a.m. per health care. She did sign a refusal form and was informed of the risks to her and her unborn child. She was informed that with [sic] being able to do weekly Gyne. exams that there is no way to determine cervical dilation or position of the fetus." White Dep. Ex. 16. The treatment refusal form is found at White Deposition Exhibit 1. White admits she signed the refusal form.

**September 21, 2009** – Nurse Gill wrote a log note stating that Westwood OB called back, and Dr. Lewicky would see White "next Tuesday." *See* Downey Dep. Ex. 6-4.

**September 22, 2009** – White awoke with abdominal and back pain and called for assistance. JCDC records reflect a call from White's cell at 5:10 a.m.[5] The fire department received a dispatch at 5:13 a.m., and the ambulance crew arrived at 5:22 a.m. White was assessed and transported to St. Mary's Hospital in Kankakee.

White arrived at the hospital at 5:52 a.m. At 5:54 a.m., hospital staff took White's medical history. At 6:07 a.m., the baby's fetal heart tones were examined using a fetal heart monitor. The nurse was unable to find any fetal heart tones. At 6:08 a.m., a bedside ultrasound revealed that the baby had a very slow heart rate. At 6:13 a.m., the decision was made to perform an emergency cesarean section. Johnay was delivered at 6:33 a.m. During the cesarian section the doctor discovered that White had a complete abruption of the placenta which stopped the flow of oxygen to the fetus. Johnay was not breathing when she was born. She was resuscitated immediately and was transported to the University of Chicago Hospital. The oxygen deprivation resulted in severe, permanent physical and mental disabilities.

## ANALYSIS

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order

---

[5] The chronological log indicates that breakfast arrived, was served, and picked up at 5:25 a.m. That entry is followed by a "late entry" (*i.e.*, out of chronological order) that at 5:10 a.m. White complained of back and stomach pain. The next entry reflects that White was "out by ambulance" at 5:31 a.m.

3

to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2000). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

The court has carefully reviewed the arguments, authority, and exhibits presented by the parties. Any arguments not addressed herein were considered and rejected or are not central to the relevant issues. Therefore, for the sake of expediency, the court discusses only the issues pertinent to the court's ruling.

### Federal Tort Claims Act

Lipsey proceeds against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*. The United States, as sovereign, is immune from suit unless it has consented to be sued; the consent defines the court's jurisdiction to hear the case. *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir. 1993). Where there is no consent, the district court lacks jurisdiction over the suit. *Broussard*, 989 F.2d at 174.

The United States argues that it is not liable under two provisions of the FTCA: (1) the independent contractor exception, and (2) the discretionary function exception. If those exceptions apply to this case, they operate as a jurisdictional bar to suit against the United States. *See Alinsky v. United States*, 415 F.3d 639 (7th Cir. 2005) (affirming dismissal under independent contractor exception); *Calderon v. United States*, 123 F.3d 947 (7th Cir. 1997) (affirming dismissal under discretionary function exception).

Lipsey argues that the independent contractor exception does not apply because the government had a duty for the entirety of White's custody at JCDC to ensure that White was receiving appropriate prenatal care. Lipsey also argues that the discretionary function exception does not apply because relevant USMS directives in place at the time dictate mandatory -- not discretionary -- conduct. The United States asserts that its involvement with White was limited to September 11, 2009, while White was in USMS custody at the courthouse cell block until JCDC officials picked her up and took her to JCDC. The government denies that Downey called USMS on September 17, 2009, but if the call was made, its involvement with White is limited to two dates: September 11 and September 17.

4

Independent contractor exception

The FTCA provides for government liability based on the negligent or wrongful acts or omissions of a government employee. 28 U.S.C. §1346(b).

"'Employee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." *Logue v. United States*, 412 U.S. 521, 526 (1973) (quoting 28 U.S.C. § 2671).

"As used in this chapter and sections 1346(b) and 2401(b) of this title, the term 'Federal agency' includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." *Logue*, 412 U.S. at 526 (quoting 28 U.S.C. § 2671).

Lipsey asserts that the contract between the USMS and JCDC did not relieve the United States from its responsibility to provide for the safekeeping, care, and protection of federal detainees.[6] He argues that USMS employees' failure to do so is evidence of the government's own negligence. Therefore, he argues, the independent contractor exception does not apply, and the USMS is liable for the entire time period of White's detention at JCDC.

In *Logue*, a federal detainee housed in a county jail hanged himself. *Logue*, 412 U.S. at 522. The plaintiff argued that the United States was liable for the conduct of the jail's employees. *Logue*, 412 U.S. at 528. The Court disagreed; the jail employees did not become federal employees by virtue of the contract between the government and the jail, and the jail employees were not acting on behalf of the government by performing services for federal detainees. *Logue*, 412 U.S. at 529-32.

The Court discussed the duty of the government to provide for the safekeeping, care, and subsistence of federal prisoners and detainees specified in 18 U.S.C. § 4042, noting that the same public law allowed the government to contract with state and local authorities to provide that safekeeping and care. *Logue*, 412 U.S. at 529. In doing so, Congress "rather clearly

---

[6] When deposing at least one former employee of the USMS, Plaintiff's counsel read specific language from relevant documents and asked the deponent if he was aware that the documents and directives said what had been read. The deponent sometimes responded that he did not know that. This game of "gotcha" is transparent and unavailing; it does not create an issue of fact as to whether the deponent was aware of his duty to ensure proper care of federal detainees. It would be most unusual for a deponent to have memorized lengthy work-related documents (including USMS directives) and retained that information despite having retired from his job. It was clear the deponent was familiar with the obligations and requirements to which he and the USMS must adhere with regard to detainee safekeeping, etc.

contemplated that the day-to-day operations of the contractor's facilities were to be in the hands of the contractor, with the Government's role limited to the payment of sufficiently high rates to induce the contractor to do a good job." *Logue*, 412 U.S. at 529. The Court noted that the lower courts seemed to have overlooked, rather than rejected, whether the deputy marshal was negligent for failing to warn the jail of the deceased's suicidal tendencies. *Logue*, 412 U.S. at 533 (remanding on that issue).

Several factually similar cases guide the court in its analysis; each involved federal detainees or inmates housed in county jails. *See, e.g., Logue*, 412 U.S. 521; *Cosby v. United States*, 2012 WL 385425 (3d Cir. 2012) (partial amputation of diabetic inmate's foot); *Bailey v. U.S. Marshals Serv. Headquarters*, 426 Fed. Appx. 44 (3d Cir. 2011) (attack by jail inmate); *Toomer v. County of Nassau*, 2009 WL 1269946 (E.D.N.Y. May 5, 2009) (assault by jail inmate); *Bethae v. United States*, 465 F. Supp. 2d 575 (D.S.C. 2006) (deprivation of asthma inhaler leading to death); *Johnson v. United States*, 2006 WL 572312 (E.D. Va. 2006) (untreated prostate cancer resulting in death). In those cases, the court determined that the independent contractor exception applied and the United States could be held liable only for the conduct of its own employees. In *Lopez v. United States*, 349 F. Supp. 2d 179 (D. Mass. 2004), the court noted that it had been unable to uncover *any* case in which a county jail has not been held to be an independent contractor, but it permitted the plaintiff to conduct limited discovery on the issue. *Lopez*, 349 F. Supp. 2d at 190.[7]

The same conclusion is warranted in this case. White's care was delegated to JCDC. The court concludes that the independent contractor exception negates governmental liability arising from White's day-to-day medical supervision and care.

Discretionary function exception

Whether the government is liable for specific acts or omissions of USMS employees on September 11 and September 17, 2009 is a different issue. The court must determine, for each discrete act pertaining to White's custody and care, whether the act falls within the discretionary function exception.

The discretionary function exception shields the government for an act or omission of an employee exercising due care while performing, or failing to exercise or perform, a discretionary function, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The court's inquiry is a two-step process. "First, the act involved must be discretionary in the sense that it 'involves an element of judgment or choice.' . . . Second, 'the exception protects only governmental actions and decisions based on considerations of public policy.'" *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014) (internal citations omitted).

---

[7] *Walding v. United States*, 955 F. Supp. 2d 759 (W.D. Tex. 2013) is similar but factually distinct; it pertained to detained unaccompanied alien minors temporarily housed in a non-federal facility.

The government argues that its employees performed discretionary functions with regard to White, based on considerations of public policy. The government's first contact with White occurred on September 11, 2009. White claims that while in the holding cell at the U.S. Courthouse in Hammond, Indiana, a marshal service employee was "pretty pissed off" at her and was cussing and telling her that nobody wanted to take her and if she had just turned herself in, things would have been a lot easier. The employee told her that she might have gone to a program that allowed mothers to keep their infants with them during their incarceration, but it was apparently too late in her pregnancy to transfer her to that sort of setting. Instead she would have to go to a local jail. She was transported to JCDC without incident. No liability arises from the USMS employee's use of harsh words.

The next discrete act on September 11, 2009, was the selection of JCDC as an appropriate housing option for White. At that time, Jeffrey Goble ("Goble") was a supervising deputy United States marshal working in the courthouse for the Northern District of Indiana, Hammond Division. The cell block there was not used for overnight stays, and at the end of the day *all* detainees/inmates were sent out to state or local jail facilities. It was Goble's duty to find a bed for a detainee in federal custody. The USMS had an intergovernmental agreement ("IGA") with JCDC and several other facilities where detainees/inmates could be housed while in federal custody. He could have placed White at the Hammond city jail, or the jails in Porter County and Lake County, Indiana, but he felt the best placement for White was JCDC because in his opinion it had the best medical facilities and staff.[8] (Although the plaintiff suggests that White could have been transferred to a facility in Chicago, Goble testified that he did not have that option.) None of the facilities from which Goble could choose had onsite obstetrical staff. The USMS was not mandated to transfer White to a particular facility. Goble exercised his discretion by selecting JCDC to house White.[9]

The last incident with the USMS is the phone call on or around September 17, between Downey and an unidentified individual at the USMS. Downey states that he felt JCDC could not provide the care White needed, and asked the USMS to transfer White to a location where obstetrical care would be more readily available, but the USMS denied the request. The USMS denies having received any such phone call. On summary judgment, the court must construe factual disputes in the light most favorable to Lipsey. The court must assume that the call was made, and the request was denied.

---

[8] Pursuant to the IGA, the facility was to provide routine medical care to federal detainees as part of the daily fee paid by the USMS. If a medical condition arose that its medical staff could not treat, the detainee was to be taken to the hospital or emergency room, with the USMS liable for payment of those costs.

[9] Similarly, in *Toomer*, 2009 WL 1269946, at *12, the district court concluded that the federal employee's decision to place the plaintiff in a particular jail was discretionary.

When deposed, Downey was asked to recall as precisely as he could what he said during the phone call. Downey stated,

> I contacted Indiana because of the issue of not being able to find an OB doctor, this original Dr. Haile, and just indicated that we can't find an OB doctor, but we would keep trying, however, if they could take her back, you know, we would just as soon send her back to Indiana and let them find an adequate place for her.

Downey Dep. 83. At that time, there was no emergency, no apparent reason to transfer White to a hospital for care, and an ongoing attempt by JCDC to obtain obstetrical services for White.[10] Four days later, JCDC *did* locate a doctor willing to treat White, and scheduled an appointment for her. White went into early labor the next morning.

In *Bethae*, the USMS's failure to transfer a federal detainee to another facility for better medical care was ruled to be discretionary. *Bethae*, 465 F. Supp. 2d at 582 (citing *Carter v. United States*, 2002 WL 32332081, at *5 (D.S.C. Dec. 13, 2002)). "[T]he mandatory duty of care [for prisoners' safekeeping] set out in 18 U.S.C. § 4042 [and 28 C.F.R. 541.11] do[] not dictate the manner in which that duty must be fulfilled." *Bethae*, 465 F. Supp. 2d at 582 (quoting *Carter*, 2002 WL 32332081, at* 5). Determining where prisoners "should be housed involve[s] an element of judgment or choice." *Bethae*, 465 F. Supp. 2d at 582.

Under the circumstances, the USMS's decision to keep White at JCDC was within its sound discretion.

The court must also consider whether discretionary decisions are grounded in considerations of public policy. An "actual 'weighing of policy considerations'" is not required. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (quoting *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997)). "If the decision is inherently one allowing discretion, we presume that the act was grounded in policy whenever that discretion is employed." *OSI*, 285 F.3d at 951 (citing *United States v. Gaubert*, 499 U.S. 315, 324 (1991)). Goble made his decisions for housing detainees by weighing such policy considerations as transportation, separation of detainees, and space available at the various facilities as well as the medical needs of the detainees. In White's case, gender was also a consideration. Deciding to place a detainee in one facility versus another was not a one-size-fits-all proposition. The decision was grounded in public policy.

The court concludes that the discretionary function exception shields the government from liability for conduct relating to White on September 11 and 17, 2009.

---

[10] White evaded law enforcement for several months over the summer and apparently received no regular prenatal care during that time. She was taken into custody on September 10. Downey states that he called USMS on or around September 17. By then, White was still a month from her due date and did not report any urgent problems with her pregnancy.

CONCLUSION

For the foregoing reasons, the motion for summary judgment for lack of waiver of sovereign immunity [231] is granted. The government's motion [247] in limine and motion to strike is moot. The plaintiff's motion [251] to strike sections of the reply brief filed by the United States is also moot. The clerk is directed to enter judgment in favor of the United States and against the plaintiff at the conclusion of the case.

The Kankakee County defendants' motion for summary judgment [234] remains pending.

Entered this 26th day of May, 2016.

/s/Harold A. Baker
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE