FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| JOHN LIPSEY, Individually as father and next friend of J.L., a disabled minor, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No.: 12-2100 ) |
| UNITED STATES OF AMERICA, KANKAKEE COUNTY, a body politic, THE SHERIFF OF KANKAKEE COUNTY, TIMOTHY F. BUKOWSKI, MICHAEL DOWNEY; HEATHER GILL, R.N., TIMOTHY MENARD, P.A., CLYDE DAYHOFF, D.O., IVETTE CHAREE SANGSTER, L.P.N., and MJS ADVANTAGE, INC., a corporation, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**ORDER ON MOTION
FOR SUMMARY JUDGMENT**

The Kankakee County Defendants have filed a Motion for Summary Judgment. For the reasons set forth below, the Motion [234] is GRANTED.

**BACKGROUND**

Wenona White was pregnant and in the last trimester of her pregnancy when she was taken into federal custody. J.L. is the child that White delivered while in custody, and John Lipsey is J.L.'s father. The relevant allegations in Plaintiffs' Amended Complaint arise out of White's time at the Jerome Combs Detention Center ("JCDC") between September 11, 2009, and September 30, 2009. The JCDC is owned, operated, and managed by Defendant Kankakee County. Defendant Timothy Bukowski ("Bukowski") is the Sheriff of Kankakee County.

During the summer of 2009, White and others were wanted on federal bank fraud charges. At that time, White was pregnant with her tenth child. A criminal complaint was filed against White in the Eastern District of Virginia on June 8, 2009, and White was to self-surrender at the federal courthouse in Hammond, Indiana, on July 6, 2009. Needless to say, she did not surrender as expected.

On September 10, 2009, White was located, taken into custody, and place overnight at the St. Joseph County Jail in Indiana. The next day, she was transported by the United States

Marshall Service ("USMS") to the federal courthouse in Hammond for a court appearance. The Court ordered White remanded to the custody of the USMS and transported to the United States District Court for the Eastern District of Virginia. At that time, she was approximately 35 weeks pregnant, so the USMS arranged for White to be housed at the JCDC pursuant to a contract fo the safekeeping and care of federal detainees, with the expectation that she would remain there until after she gave birth to her child.

While in the custody of the USMS on September 11, 2009, White did not have any symptoms of illness or injury, and there was no indication that she was in immediate need of medical treatment. When deposed, White further indicated that she had had three prenatal visits with a midwife in March, April, and June 2009, but had received no prenatal care after June 2009 because she knew that she was wanted by the police.

A summary of the relevant chronology is as follows:

**September 11, 2009** - White was transferred from the courthouse in Hammond to JCDC. The JCDC intake officer obtained information from White, completed an intake form noting that White's due date was October 18 and that her last medical exam was in August, and that she took prenatal vitamins. White claims that she does not recall whether she told the intake officer about any problems she was having with her pregnancy. White Dep. 77. White admits she did not inform the intake officer that with her ninth pregnancy, she had placenta previa. White Dep. 78.

**September 12, 2009** – Nurse Sangster saw White in her housing unit. White said her due date was October 18, 2009, and that she was not having any problems with her pregnancy. Sangster Dep. 15, 23-27.

**September 16, 2009** - JCDC nurse Heather Gill ("Gill") saw White in the JCDC clinic. Gill's note states, "Inmate Seen in Clinic. Has had regular check ups with OB/GYN in Indiana. States this will be her 10th child. Denies any problems with pregnancy. Prenatal vitamins ordered. Will try to schedule apt with Dr. Mehta or Haile." White Dep. Ex. 15. White admits that she told a female nurse that she didn't have any problems with her tenth pregnancy. White Dep. 80.

**September 17, 2009** - JCDC officials had a routine meeting with medical staff. White's pregnancy was discussed. JCDC Chief of Corrections Michael Downey ("Downey") states that he was concerned about White's pregnancy and their difficulty scheduling White with an obstetrician. The notes from the meeting reflect that Dr. Haile refused to take White as a patient that late in her pregnancy. Downey stated at the meeting that he had contacted the USMS and asked that White be transferred to a different facility where obstetrical care might be more accessible. (Downey does not remember who he talked to, and USMS employees deny having received such a call.) The meeting notes reflect that "the feds" told Downey it was impossible to move White at that time. Follow-up notes indicate that Downey would continue to work on a transfer, an emergency delivery kit would be ordered, and the health care staff would monitor White very closely.

**September 18, 2009** - JCDC physician's assistant Timothy Menard ("Menard") attempted to have White come to the health care unit. A log note written by Menard states, "[White] refused to be seen this a.m. per health care. She did sign a refusal form and was informed of the risks to her and her unborn child. She was informed that with [sic] being able to do weekly Gyne. exams that there is no way to determine cervical dilation or position of the fetus." White Dep. Ex. 16. The treatment refusal form is found at White Deposition Exhibit 1. White admits she signed the refusal form. The record is devoid of any documentation indicating that White ever requested medical attention from anyone at the JDRC either before or after she refused to be seen on September 18, 2009.

**September 21, 2009** -Nurse Gill wrote a log note stating that Westwood OB called back, and Dr. Lewicky would see White "next Tuesday." *See* Downey Dep. Ex. 6-4.

**September 22, 2009** -White awoke with abdominal and back pain and called for assistance. JCDC records reflect a call from White's cell at 5:10 a.m. At this time, White was not bleeding. The fire department received a dispatch at 5:13 a.m., and the ambulance crew arrived at 5:22 a.m. White was assessed and transported to St. Mary's Hospital in Kankakee without incident. Neither the correctional officers nor the paramedics who transported White had any reason to believe that her baby was in fetal distress.

White arrived at the hospital at 5:52 a.m. At 5:54 a.m., hospital staff took White's medical history during which she denied having any complications during her pregnancy or any chronic medical problems. At 6:07 a.m., the baby's fetal heart tones were examined using a fetal heart monitor. The nurse was unable to find any fetal heart tones. At 6:08 a.m., a bedside ultrasound revealed that the baby had a very slow heart rate. At 6:13 a.m., the decision was made to perform an emergency cesarean section. J.L. was delivered at 6:33 a.m. During the cesarian section the doctor discovered that White had a complete abruption of the placenta which stopped the flow of oxygen to the fetus. The abruption most likely occurred either while White was in the ambulance or after her admission to St. Mary's. J.L. was not breathing when she was born, but she was able to be resuscitated and was transported to the neonatal intensive care unit at the University of Chicago Hospital. The oxygen deprivation resulted in severe, permanent physical and mental disabilities.

Plaintiffs brought this suit, alleging claims of medical malpractice, as well as pendent claims under the Family Expense Act and for willful and wanton conduct. Summary judgment was previously granted in favor of the United States. The remaining Defendants have now filed a Motion for Summary Judgment. The matter is now fully briefed, and this Order follows.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable

inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. Overall, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Durkin v. Equifax Check Services*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003)). Summary judgment is mandated when, after adequate time for discovery, the party who bears the burden of proof fails to make a showing sufficient to establish an essential element of that party's case. *Celotex*, 477 U.S. at 323.

Thus, in order to overcome the undisputed facts set forth in a defendants' motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

**DISCUSSION**

Sheriff Bukowski and Corrections Chief Downey

Sheriff Bukowski and Corrections Chief Downey argue that they are entitled to summary judgment on the ordinary negligence claims against them because they did not breach any duty owed to White or her unborn child. In ruling on the prior Motion to Dismiss, Judge McCuskey noted that these Defendants could not be held liable for claims of medical malpractice. He declined to dismiss them entirely, however, because whether they were negligent for accepting White into the JCDC without being properly equipped to treat her or in transferring her for delivery, or whether Plaintiffs were attempting to hold them liable for the wrongful acts of anyone working under them needed to be decided on a more complete factual record. Defendants assert that the record indicates that neither of them had any contact with White or that either of them committed any acts or omissions that would give rise to liability against them.

The Court agrees that there is no evidence indicating that these Defendants negligently accepted custody of White on September 11, 2009, as the JCDC had housed pregnant inmates in the past and had established relationships with outside local specialists on an "as needed" basis to treat inmates with specific medical issues. Kankakee County Obstetrics & Gynecology had treated their pregnant inmates in the past and had never refused to take on a pregnant inmate as a patient. Given this past relationship, the record is devoid of evidence indicating that at the time of White's arrival at JCDC, Bukowski or Downey had any inkling that Kankakee County Obstetrics and Gynecology would later decline to accept White as a patient on September 16, 2009, that they had any reason to believe that JCDC medical staff could not provide appropriate medical care, or that they had any reason to know that she was a high-risk pregnancy or would deliver early or require a cesarean delivery under emergent circumstances. There is no evidence that either Bukowski or Downey had any personal interaction with White or did anything other than rely on the expertise of their medical providers and staff, for which they cannot be held vicariously liable. Once Kankakee County Obstetrics & Gynecology declined to see White, staff made an appointment with Westwood Obstetrics that was almost three weeks before her

estimated due date. In the meantime, medical staff developed a plan for the JCDC medical staff to check her blood pressure regularly and obtain an emergency delivery kit in case White went into labor and was not transportable. As local government officers, Bukowski and Downey breached no duty of care by relying on the medical judgment of their medical directors and staff. Plaintiffs' attempted reliance on the expert opinion of Dr. Robert Greifinger, their reliance is misplaced, as his conclusory assertions of negligence do not constitute evidence that either Bukowski or Downey's purported "ordinary negligence" with respect to their management and operation of the jail was anything other than reliance on the medical judgment of their staff. Accordingly, there is no showing of anything more than vicarious liability, and both Sheriff Bukowski and Corrections Chief Downey are entitled to summary judgment.

JCDC Medical Personnel

Section 4-105 of the Tort Immunity Act provides: "Neither a local public entity nor a public employee is liable for injury proximately caused by a failure to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employ, knows from observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take the reasonable action to summon medical care." Defendants argue that White had not seen an obstetrician in more than two months preceding her arrest, but ultrasounds taken in April and July 2009 showed no abnormalities or problems with the pregnancy. It is undisputed that from the beginning of her pregnancy through her arrest, White experienced no spotting, bleeding, early labor, or problems with her pregnancy. On admission, her blood pressure was 161/86. On September 12, 2009, White told Nurse Sangster that her due date was October 18, 2009, that her last checkup had been in August, and that she was not having any problems with her pregnancy. White was seen by Nurse Gill on September 16, 2009, again denying having any problems with her pregnancy. Nurse Gill prescribed prenatal vitamins and attempted to schedule an appointment with an obstetrician. At the clinical operations meeting on September 17, 2009, Downey, Dayhoff, Menard, Gill, and Sangster discussed calling the other obstetrician practice in Kankakee to schedule an appointment for White; staff were directed to take her blood pressure regularly and monitor her closely. The staff had different views of what "regularly" meant and failed to take her blood pressure with the specified frequency. Transfer to another facility was explored, but contingency plans were made when the USMS denied the transfer. On September 18, 2009, Menard attempted to bring White to medical for an examination, but she declined to come and signed a Treatment Refusal Form. Even when Menard went to White's cell to explain the dangers to herself and baby if she wasn't examined, White persisted in her refusal. Thus, on this day, White prevented her blood pressure from being checked. There is no evidence that checking her blood pressure more frequently would have revealed the placental abruption to enable Defendants to have prevented it.

To be excluded from immunity under § 4-105, Defendants had to (1) know that White needed immediate medical care through personal observation, and (2) despite this knowledge, willfully and wantonly fail to summon medical care. There is simply no evidence that any of the medical providers at JCDC ever knew from personal observation that White or her pregnancy were in danger or required immediate medical care before the morning of September 22, 2009, or that they willfully and wantonly failed to summon immediate care when it was needed. No

acute condition or medical emergency was observed at the time of her admission to the JCDC or at any time prior to September 22, 2009, when White made her first request for medical attention at JCDC. Paramedics were summoned within three minutes of an officer being notified that White was in pain. The ambulance arrived nine minutes later, and White was examined to find no bleeding, normal pulse, normal respiration, normal oxygen, and a normal heart rhythm. She was in the ambulance to be transferred to the local hospital within 10 minutes of the paramedics' arrival at JCDC. The ambulance arrived at the hospital 20 minutes later, and the transfer was reportedly without incident, with White again reporting to paramedics that she had no complications with her pregnancy.[1] Upon further examination at the hospital, it was discovered that the placenta had detached from White's uterus, which completely stops the flow of oxygen to the fetus and can result in ischemic injury and fetal death within minutes.[2] Even Plaintiffs' expert, Dr. Greifinger concedes that there is no evidence of undue delay by anyone on the morning that White went into labor, and at the hospital, where medical staff has no personal interest in the outcome of this case, White reported to the intake nurse that she had not had any complications during her pregnancy or any chronic medical problems.

Given that a complete abruption of the placenta can cause ischemic injury and fetal death within minutes and the fact that J.L. was able to be resuscitated relatively easily, a reasonable factfinder would conclude that the placental abruption occurred either during the ambulance transport or at the hospital, and it was the abruption that caused J.L.'s injuries. In fact, Dr. Taylor, the physician that treated White at the hospital, testified that the complete placental abruption that he observed was sudden and most likely occurred after White was admitted into the hospital, because if the abruption had occurred earlier, J.L. would have been dead and could not have been resuscitated by the hospital staff after the cesarean section. It is further undisputed that since White did not experience any pain, bleeding, contractions, or labor the night of September 21, 2009, it is very unlikely that her placenta began to detach that night.

Plaintiffs have not cited any case law for the proposition that the fact that White was pregnant, in and of itself, necessitates immediate medical care. The evidence in this case shows, at best, that Defendants were aware that White was in her last trimester of pregnancy, had blood pressure of 161/86 on admission, repeatedly denied experiencing any problems or complications with her pregnancy, and made no request for medical attention until the morning of September 22, 2009. The record does not establish that White's blood pressure caused her placental abruption or any of J.L.'s injuries. To the contrary, Plaintiff's pediatric neurological expert, Dr. Michelle Melyn opined that J.L.'s injuries were the result of the hypoxic/anoxic insult that she suffered on the morning of September 22, 2009, when the placenta abrupted from White's uterus and that without this, she would have been neurologically normal. It is undisputed that an ultrasound or other fetal monitoring conducted during White's time at the JCDC would have shown only normal growth and would not have revealed the acute placental abruption that had not yet occurred. There is also evidence that an examination would not have revealed fetal distress.

---

[1] To the extent that Plaintiffs failed to properly deny assertions of undisputed fact, they are deemed admitted pursuant to Local Rule 7.1(D)(2)(b)(6).
[2] Again, Plaintiffs place this fact in the disputed section but fail to cite to any contrary evidence of record. Failure to properly dispute an assertion of undisputed fact renders the fact undisputed under Local Rule 7.1(D)(2)(b)(6).

Plaintiffs have not demonstrated that anything Defendants could have done differently was either done with willfully and wantonly or would have made a difference in the outcome of J.L.'s delivery. The Court finds that Defendants are entitled to immunity pursuant to § 4-105 of the Tort Immunity Act. Given this record, the Court also finds that they would be entitled to immunity under §§ 6-105 and 6-106, as there is no evidence establishing that they should have made a different diagnosis before White began having problems on September 22, 2009, or failed to administer prescribed treatment. They are therefore entitled to summary judgment in this respect.

## CONCLUSION

J.L.'s medical conditions and injuries are tragic, and the Court is not unsympathetic to the suffering that J.L., her father, and her mother have endured as a result. However, the Court's sympathy cannot change the law or the facts established in this record by admissible evidence to achieve a more compassionate result. The actions of the Kankakee Defendants were reasonable given what they knew at the time, and there is nothing in the record to indicate that they had any reason to foresee that White's placenta would abruptly detach and deprive the unborn child of oxygen. For the reasons set forth above, the Kankakee Defendants' Motion for Summary Judgment [234] is GRANTED. This matter is now terminated, and all existing deadlines are vacated.

ENTERED this 12th day of December, 2016.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge